**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

*ex rel.* [UNDER SEAL],

Plaintiffs,

v.

[UNDER SEAL],

Defendants.

---

Civ. Action No. _____

22 CV 767-LJV

**COMPLAINT**

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

**DEMAND FOR JURY TRIAL**





UNITED STATES DISTRICT COURT
FILED
OCT 1 1 2022
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*ex rel.* NATHAN PAUL,<br><br>Plaintiffs,<br><br>v.<br><br>PCB PIEZOTRONICS, INC., and Does 1-100,<br><br>Defendants. | Civ. Action No. _____<br><br>**COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

On behalf of the United States of America, Relator Nathan Paul files this Complaint against PCB Piezotronics, Inc. and Does 1-100 (collectively referred to as "Defendant" or "PCB"), and alleges as follows:

## INTRODUCTION

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America in connection with a scheme by PCB designed to circumvent its contractual obligations—with both the Federal Government and with government contractors—to maintain counterfeit-parts-prevention protocols per federal regulatory guidance, in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended ("FCA").

2.      The aeronautical industry has an unfortunate history of plane crashes and other catastrophic accidents caused by counterfeit parts that find their way into the supply chain and, unbeknownst to aircraft builders, lead to the construction of unsafe vehicles with abnormally high malfunction risks.  As a result, the Federal Government carefully regulates this industry and

imposes on manufacturers complex compliance requirements aimed at detecting, removing, and mitigating the reappearance of counterfeit parts in the supply chain.

3.      PCB is a manufacturing company in the aeronautical industry that creates various piezoelectric quartz sensors, accelerometers, and associated electronics that measure dynamic pressure, force, and vibration. Many of PCB's devices are sold through federal contractors to the United States military, which uses them in the aircrafts it builds. These devices are essential for ensuring aircraft safety.

4.      Due to its valuable devices, PCB has acquired numerous lucrative government contracts, both as a primary contractor to the United States Navy and as a subcontractor to other primary contractors. These contracts all require strict compliance with applicable federal regulations—an expectation that PCB does not always meet.

5.      Relator joined PCB in March 2017 as an internal auditor, a position that required ensuring compliance with all the regulations and requirements that governed PCB's contracts. When Relator joined the company, PCB proved unable to show compliance due to its inadequate counterfeit-parts-detection program. As a result, many of its lucrative government contracts were suspended.

6.      PCB's contracts were soon reinstated because the company had crawled its way back into compliance with these counterfeit-parts-detection requirements—or so it seemed. As time progressed, Relator still noticed, among many other problematic noncompliance issues, insufficient protocols for detecting counterfeit parts. The insufficient protocols persisted, but PCB was carrying out—and was being paid pursuant to—its many government contracts as if the company had actually been honoring its legal and contractual obligations.

7. Relator spent the better part of 2019 raising these specific concerns to an array of PCB personnel, ranging from his direct supervisor, Dave Dulanski, to Human Resources officials, among many others. Nearly every attempt to make someone listen was struck down with hostility. Relator was reprimanded, both orally and in writing, by various PCB personnel. Over time, Dulanski whittled away at Relator's authority and autonomy as an internal auditor, making it harder and harder for Relator to adequately do his job.

8. In October 2019, PCB terminated Relator's employment because he continued to try to point out these pervasive noncompliance issues.

9. Meanwhile, PCB continues to enjoy its lucrative government contracts, even though it fraudulently, albeit impliedly, certifies its compliance with the regulations that those contracts—and federal law—demand. Not only does PCB's fraudulent conduct endanger the safety of the United States military, but it has also caused the submission of numerous false claims to the Federal Government.

10. If a government contractor violates a material statutory, regulatory, or other requirement provided in its government contract and requests payment from the Federal Government without disclosing that violation, then the contractor has submitted an "implied" false claim under the FCA. Such conduct would subject the contractor to the same liability under the FCA as though it had it made the false claim expressly.

11. Similarly, if a government subcontractor violates a material statutory, regulatory, or other requirement provided in its contract with a government contractor, fails to disclose that violation to the contractor who, in turn, requests payment from the Federal Government, then the subcontractor has caused the submission of an implied false claim. In such a situation, the

4

subcontractor is liable under the FCA, just as if it had expressly and directly submitted a false claim to the Federal Government itself.

12.     PCB's contracts—both those directly with the Federal Government in which PCB serves as a primary contractor, and those with other government contractors in which PCB serves as a subcontractor—demand compliance with various federal regulations, including those requiring PCB to establish and maintain adequate counterfeit-parts-prevention programs to address the appearance of counterfeit parts in the supply chain.  But by casting these obligations to the wind, PCB has blatantly, consistently, and systematically violated its numerous contracts.  PCB has also done so secretly; it does not disclose these violations with its contract counterparties. Instead, in its direct contractual relationships with the Federal Government, PCB requests payment as though it has fully complied with its obligations.  And, in its contractual relationships with other government contractors, PCB deceives its contractor-partners into requesting payment from the Federal Government while wholly concealing its noncompliance from them.  PCB's conduct in both situations violates the FCA.

## PARTIES

13.     Relator Nathan Paul is a citizen of the United States and a resident of the State of New York.  Relator is an original source and has direct, personal, and independent knowledge of the information upon which the allegations herein are based.

14.     PCB, a wholly-owned subsidiary of MTS System Corporation, specializes in the manufacturing of piezoelectric quartz sensors, accelerometers, and associated electronics that measure dynamic pressure, force, and vibration.  As a result of such expertise, PCB maintains contracts with numerous aeronautical government contractors to supply them with its sensors,

accelerometers, and other devices.  PCB is headquartered in Buffalo, New York, with other offices in North Carolina, Michigan, Utah, Ohio, and upstate New York.

15.     Relator is unaware of the true names of certain defendants sued herein under the fictitious names Does 1-100 and will seek leave to amend this Complaint to sue such parties by their actual names at such time as Relators become aware of them.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this False Claims Act claim pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3729(a), which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

17.     This Court has personal jurisdiction over PCB pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred."  Section 3732(a) also authorizes nationwide service of process.  During the relevant time period of this Complaint, PCB resided and transacted business in the Western District of New York, and most of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

18.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because PCB can be found in, resides in, and transacts business in the Western District of New York, and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

19.     Relator is not aware that the allegations in this Complaint have been publicly disclosed.  Further, to the extent Relator is aware of any public disclosures, this Complaint is not based upon such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because Relator is an "original source" because he has provided information voluntarily

to the Government before filing this Third Amended Complaint and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## GOVERNING LAWS AND CODES OF CONDUCT

### A.    THE FCA

20.    The FCA, as amended following its enactment in 1863, "enhance[s] the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986).

21.    In that spirit, the FCA imposes a civil penalty of $11,000 for each false or fraudulent claim presented to the Government, plus three times the amount of damages the Government sustains. 31 U.S.C. § 3729(a)(1).

22.    Such liability attaches to any individual or entity that:

(i) "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval," *id.* § 3729(a)(1)(A);

(ii) "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B); or

(iii) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," *id.* § 3729(a)(1)(G).

23.    Acting "knowingly" means acting "in reckless disregard for the truth or falsity of the information." *Id.* § 3729(b)(1). A specific intent to defraud is not required. *Id.*

24.    A "claim" is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property," which is:

(i) "presented to an officer, employee, or agent of the United States," *id.* § 3729(b)(2)(A)(i); or

7

> (ii) "made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest," and if the Government:
>
>> (a) "provides or has provided any portion of the money or property requested or demanded," *id.* § 3729(b)(2)(A)(ii)(I); or
>>
>> (b) "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded," *id.* § 3729(b)(2)(A)(ii)(II).

25.     The false claim can be presented in a variety of ways, including "impliedly." "[W]hen a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement," then such would render the defendant's claim "false or fraudulent" under § 3729(a)(1)(A). *United Health Servs. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 1995 (2016).

26.     In addition, in this "implied" false claim context, FCA liability is not circumscribed to only those primary government contractors who ultimately submit the final payment request to the government. Rather, subcontractors, too, are liable under the FCA if they "cause a [primary] contractor to submit a false claim to the Government." *United States v. Bornstein*, 423 U.S. 303, 309 (1976); *see also U.S. Dep't of Transp. ex rel. Arnold v. CMC Eng'g*, 564 F.3d 673, 678 (3d Cir. 2009).

27.     A private person with information about a false or fraudulent claim against the Government may, under the FCA, bring an action on the Government's behalf and share in any recovery. 31 U.S.C. §§ 3730(b), (d).

## B.    PCB's Government Contracts

28.    PCB served as a subcontractor for numerous primary government contractors, including Northrup Grumman, Lockheed Martin, Raytheon, and SpaceX.  These companies provide their subcontractors with certain business-conduct standards, which the subcontractors are required to follow as a condition of doing business.  These standards require subcontractors to, among other things, implement internal programs to check for any counterfeit parts in their step of the supply chain.

29.    For instance, Northrop Grumman requires "suppliers to develop, implement, and maintain methods and processes appropriate to their products to prevent the introduction of counterfeit parts and materials into deliverable products.  Suppliers must ensure that effective processes are in place to detect counterfeit parts and materials, as applicable, and exclude them from the delivered product."

30.    Similarly, Lockheed Martin requires, where appropriate, a supplier to

establish and maintain a counterfeit parts / material prevention and control plan using AS5553 and/or AS6174 to ensure that counterfeit work is not delivered.  The purpose of the supplier's plan *shall* be to develop a robust process to prevent the delivery of counterfeit commodities and to control commodities identified as counterfeit.  Where possible, semi-conductor distributors *should* be certified to AS6081.

31.    SpaceX, though less specific than Northrop Grumman and Lockheed Martin regarding suppliers' counterfeit-parts-detection programs, requires its suppliers to maintain "high standards of business ethics."  SpaceX requires that suppliers "conduct their business activities in compliance with all applicable laws and regulations while conducting business with and or on behalf of SpaceX," among other, more specific compliance requirements.  SpaceX also requires suppliers to "promptly notify SpaceX of any known or suspected improper behavior by suppliers relating to their dealings with SpaceX."

32.     Meanwhile, Raytheon—in addition to assuring its commitment to compliance with all applicable laws and regulations—notes in its code of conduct the importance of protecting against the use of counterfeit parts.  Raytheon explains that the

> success of both Raytheon and our customers depends on all of us emphasizing quality and excellence in the products and services we provide. This means having a mission assurance mindset and complying with all contract and government requirements. Employees should take personal responsibility and make compliance with quality standards a priority to build on the company's record of excellence, give the company a competitive advantage and protect our reputation, while abiding by government laws and regulations.

33.     PCB also had several contracts with Electric Boat Corporation, a subsidiary of Navy-contractor General Dynamics.  Electric Boat Corporation required, among other things, that its suppliers "establish and maintain an internal quality audit program" in order "to determine compliance to purchase order requests."  Such programs required adequate internal documentation, as well as the implementation of follow-up audits to determine that any initially-revealed nonconformity is remedied.

34.     In light of these contractual obligations, as well as federal regulatory guidance, PCB has established and maintained an AS9100 Quality Management System, which requires, among other things, the maintenance of an internally-maintained counterfeit-parts prevention program according to the Control of Externally Provided Processes, Products and Services provisions under the ISO 9000 family of quality-management-system regulations.

35.     Specifically, these provisions require companies like PCB to ensure that externally provided processes, products and services conform to requirements. The organization shall determine the controls to be applied to externally provided processes, products and services when:

> a) products and services from external providers are intended for incorporation into the organization's own products and services;

10

b) products and services are provided directly to the customer(s) by external providers on behalf of the organization;

c) a process, or part of a process, is provided by an external provider as a result of a decision by the organization.

The organization shall determine and apply criteria for the evaluation, selection, monitoring of performance, and re-evaluation of external providers, based on their ability to provide processes or products and services in accordance with requirements. The organization shall retain documented information of these activities and any necessary actions arising from the evaluations.

ISO 9001:2015(E) § 8.4.1.

**C.     PCB's Internal Policies**

36.     To reinforce the compliance culture required by both federal regulations and its government-contractor contracts, PCB echoes similar requirements in its own internal policies.

37.     For example, PCB represents in its Policy Manual that it "has planned, implemented, and controls processes appropriate for [the] organization and product; for the prevention of counterfeit or suspect counterfeit part use or inclusion into products delivered to [its] customers."

38.     In addition, PCB's employee-training materials convey the company's commitment to "follow legal, ethical and compliant business practices." The materials encourage employees to seek help from the Office of Risk and Compliance and their managers when confronted with unclears questions or issues.  Managers are required to, among other things: "[l]ead by example"; "[c]ommunicate and promote legal, ethical and compliant practices"; "[c]reate and promote a speak up culture"; and "[a]void acts of retaliation or conduct that could be perceived as retaliatory."

39.     In addition, PCB imposes its own Code of Ethics on its employees and "strictly prohibits actions of retaliation against individuals who report possible violations of [the Code]."

11

## SPECIFIC ALLEGATIONS

A.  **Regulating Counterfeit Aeronautical Parts: The Government's Response to a Lengthy, Dangerous History**

40.  In a global economy riddled with all kinds of counterfeit goods, counterfeit aeronautical parts pose an especially serious risk. Dating back as early as the 1980s, the use of such counterfeit parts has caused numerous aircraft crashes and even more deaths.[1] These problems have persisted in recent years, garnering negative press attention for both the companies that manufacture the faulty aircrafts and the companies that manufacture the component parts for those aircrafts.[2]

41.  The Federal Aviation Administration ("FAA") heavily regulates the aeronautical-parts supply chain to mitigate the risk of counterfeit parts finding their way into aircrafts. Aircraft manufacturers with government contracts must certify their compliance with the applicable federal regulations to receive payment. Because of this requirement, government contractors like Northrop Grumman and Lockheed Martin, among others, include in their agreements with their subcontractors (like PCB) provisions to ensure such compliance at their step in the supply chain. This incentive structure helps minimize the total amount of counterfeit parts that ultimately make their way into aircrafts.

42.  For PCB, the counterfeit-parts-prevention requirements in its contracts with various primary government contractors not only exist to ensure compliance with federal regulations, but also to mitigate the risk of preventing dire—and avoidable—aircraft disasters.

---

[1]  https://www.irishtimes.com/news/bogus-parts-for-aircraft-implicated-in-many-crashes 1.1106164?mode=print&ot =example.AjaxPageLayout.o.

[2]  *See, e.g.,* https://www.nbcbayarea.com/news/local/unapproved-airplane-parts-creating-safety-risk-in-aviation/110281/.

43.     The consequence of noncompliance goes beyond mere negative press; it can also amount to legal liability.  For instance, in December 2017, United Technologies, a Connecticut-based aerospace supplier, entered a $1.06 million settlement with the United States Department of Justice to "resolve claims that a company it indirectly owned falsely certified the authenticity of counterfeit parts incorporated into U.S. Army helicopter engines" while that then-owned company served as a subcontractor to an Army contractor.  In the wake of the settlement, the then-United States Attorney for the District of Connecticut articulated the Justice Department's serious posture regarding such cases, noting that "[v]ulnerabilities caused by counterfeit parts will not be tolerated."[3]  Such sentiments continue to hold true today.[4]

**B.     Relator Joins PCB, a Company Stumbling Through this Regulatory Landscape**

44.     PCB relies on its compliance department to help spot and implement remedies for suspected compliance issues, including compliance requirements imposed by the FAA.  If the compliance department uncovers a compliance violation, it issues a Non-Conformity Report ("NCR") that states the compliance issue, cites objective evidence that such an issue exists, and provides further analysis, including a recommended "corrective action" to alleviate the issue.

45.     In March 2017, Relator joined PCB as in internal auditor; he was stationed at PCB's headquarters in Buffalo, New York.  Upon Relator's arrival, the internal audit team was composed of three individuals:  Relator; Dave Dulanski, PCB's quality assurance manager and Relator's direct supervisor; and Joseph Garza, who was stationed in PCB's North Carolina office.

---

[3] *See* https://www.reuters.com/article/us-utc-settlement-idUKKBN1ED292.

[4] In September 2022, the Pentagon announced that it temporarily stopped accepting new F-35 fighter jets because its contractor, Lockheed Martin, uncovered an engine part that had been made in China; such stoppage allowed the United States Department of Defense to review the matter and ensure compliance with federal regulations.  *See* https://www.msn.com/en-us/news/us/pentagon-stops-f-35-deliveries-after-discovery-of-engine-part-made-in-china/ar-AA11zFtC?ocid=entnewsntp&pc=U531&cvid=ebd45af86e7c4978a3795a576f27e37f.

46.     Shortly after Relator joined PCB, the company was subject to a third-party audit from its registrar, DQS.  DQS is an internationally recognized auditing organization, responsible for conducting surveillance audits to ensure PCB maintains an adequate Quality Management System ("QMS") that conforms to the AS9100D aerospace regulation.[5]

47.     At the end of the audit, DQS prepared seventeen discrete findings that highlighted the deficiencies of PCB's QMS, as well as the company's nonconformities to AS9100D, including that the company's corrective-action processes for addressing nonconformities were not effective.[6] As a result of these findings, DQS suspended PCB's AS9100D certification until the company corrected the newly uncovered nonconformities.  Consequently, PCB was unable to fulfil any

---

[5] The aerospace industry is carefully regulated due to its high-stakes nature.  Passing an AS9100 QMS audit "verifies the existence of a strong QMS and qualifies the company as a reliable manufacturer to its customers, including the U.S. Government and Department of Defense.  AS9100 certification is universally recognized, which allows an AS9100 QMS certified company to gain access to worldwide markets." www.mastercontrol.com/quality/qms/as9100-qms/.

The AS9100D certification

is a company level certification based on a standard published by the Society of Automotive Engineers (SAE) titled "Quality Management Systems - Requirements for Aviation, Space and Defense Organizations".  This standard revises the previous issue, AS9100C.

This certification is for organizations doing business in the aerospace industry such as manufacturers, contractors, and suppliers.  New requirements emphasize the prevention of risk and counterfeit parts, providing a structure that enables businesses to adapt to change, planning for obsolescence, and addressing product safety concerns.  The requirements in this standard are not alternative to customer/applicable statutory or regulatory requirements.  In cases of conflict, the customer/applicable statutory or regulatory requirements will take priority.

Certifications are issued by third party certifying bodies.  For an organization to maintain AS9100D certification, they will be subjected to annual or regularly scheduled audits where the organization's compliance with the standard is evaluated by the certifying body.

[https://certifications.thomasnet.com/certifications/glossary/quality-certifications/sae/as9100d/.]

In essence, a company with an AS9100D certification means that company has a quality-management system (QMS) that is certified under AS9100.

[6] In 2016, DQS had made a similar finding of nonconformance, noting that PCB's corrective-action processes were not effective.

orders that required AS9100 certification, including orders under its contracts with Lockheed Martin, SpaceX, and Raytheon.

48.     In the immediate aftermath following this audit, the internal audit team performed its own internal audit of the company, testing the sufficiency of the internal controls required under many of PCB's government contracts in light of an internally-issued NCR from the prior month. At the end of the audit, the internal audit team uncovered widespread noncompliance and made nearly twenty distinct findings stating such.

49.     Following this investigation, PCB placed Relator on a one-year-long track to become certified as an AS9100 auditor (aerospace), which, once attained, would give him the authority to certify and/or decertify PCB's AS9100 compliance under its contracts with primary government contractors.

50.     In the fall of 2017, PCB worked to reacquire its AS9100 certification.   After working with DQS, an international auditing company, PCB eventually came back into compliance, thereby reinstating its contracts with the Government's aerospace contractors. Relator, however, continued to notice the same culture of noncompliance as before, riddled with repeated deficiencies and inadequate corrective actions.

## C.     Relator Is Ridiculed and Ostracized in PCB's Culture of Noncompliance

51.     In 2017, PCB renovated its Buffalo, New York office.  As part of its renovations, PCB was required to implement electrostatic discharge ("ESD") protections in certain areas of the Buffalo office.  Relator, as PCB's internal auditor, flagged the areas of the office where PCB had failed to mark the ESD-protected areas as required.  Dulanski, as Relator's direct supervisor, reprimanded him for doing so and formally wrote him up.

52.     Meanwhile, during these same summer months, Relator continued to compensate for PCB's compliance issues.  He worked to help Garza, his fellow internal auditor, make sense of data and internal files that Garza should have been trained how to interpret by that point in time. He also spent time highlighting for PCB's Quality-Assurance Director certain missing policy-deployment-metrics information that PCB needed to add to its records before an upcoming audit.

53.     In response to Relator's efforts, Dulanski continued to reprimand him.  Dulanski, on more than one occasion, walked Relator out of PCB's office and, once outside on the nearby street and out of other PCB employees' earshot, told him to "lay off" drawing attention to PCB's numerous compliance deficiencies.

54.     Dulanski's attitude and approach were not unique; rather, they reflected a cavalier dismissiveness toward compliance protocol that permeated PCB's day-to-day culture.  Relator noticed several other compliance deficiencies that PCB personnel dismissed and refused to address.  Even when PCB's Human Resources department provided employee anti-harassment training, several employees—even a manager like Dulanski—treated it like a joke and dismissed its importance.

55.     In January 2019, Relator began noticing AS9100 compliance deficiencies, even though PCB's AS9100 certification was reinstated in May 2017.  Specifically, Relator noticed that PCB had not been implementing appropriate corrective actions in its Purchasing Department—as is required under AS9100—for addressing nonconformities uncovered during the audit process. Relator, having been on the internal audit team that had uncovered the nearly-twenty nonconformities during the March 2017 internal audit, realized that the reemergence of such deficiencies would result in another round of suspensions of the exact same government contracts all over again.

56.     When Relator brought this to the attention of Erin Garlock, a supplier development engineer, the two began arguing over email, with others, including Dulanski, copied onto the chain. Garlock told Relator that PCB would not be changing any of its current processes, despite their deficiency under AS9100, because doing so would jeopardize PCB's lucrative government contracts.   When Relator later sought assistance—to no avail—from the Quality Assurance department to address this issue.   Tensions flared over time, with Garlock even telling Relator to "go to hell" on one occasion after he clarified a compliance-documentation issue for her.

57.     As Relator continued to highlight PCB's compliance deficiencies to various PCB personnel, Dulanski further disrupted his efforts.   In May 2019, Relator emailed PCB personnel to highlight flaws with the compliance protocols at PCB's welding and e-tech work centers, in accordance with the "speak up culture" that PCB ostensibly promoted.   Dulanski, who Relator had copied on the original email, emailed a private response to Relator: "Stop the emails."

58.     Similarly, about one month later, on May 15, 2019, Relator emailed numerous PCB personnel to highlight various document-keeping deficiencies that continued to linger despite being noted in earlier NCRs.   Dulanski quickly responded to everyone and said that Relator's assessment was "NOT an audit finding" but rather a mere "request[]" to fix a certain type of document in PCB's engineering department.   Not only did such conduct undermine Relator's ability to successfully do his job, but it also perpetuated PCB's general culture of downplaying compliance deficiencies and leaving NCRs unresolved.

59.     Relator recognized that, in addition to causing tremendous frustration at the workplace, such widespread aversion to resolving compliance issues and such faulty counterfeit-parts-detection protocols were inherently dangerous.   Namely, the failure to implement and maintain an adequate counterfeit-parts-detection program, as required under federal regulations

and under PCB's government contracts, would likely result in counterfeit parts circulating further throughout the supply chain, which, in turn, could seriously increase the risk of life-threatening aircraft malfunction.

60.     Recognizing these dangers, Relator escalated his concerns to Human Resources.  In May 2019, in direct violation of Dulanski's demand that Relator speak to him before contacting anyone regarding noncompliance issues, Relator contacted HR to highlight his concern that PCB was choosing not to improve its quality-management-services processes—as was required under AS9100D and, by extension, was expected of PCB under its government contracts.  Relator explained that he felt PCB was violating its legal and contractual obligations, and that his supervisors expressed no interest in remedying these issues.  Relator never received a response to this email.

**D.     Relator Is Foreclosed from Finding and Addressing Other Noncompliance Issues**

61.     Once the summer approached, these cultural issues persisted.  In June 2019, Relator notified Dulanski that an audit revealed that PCB's quality manager had been signing off on incomplete records, and that such nonconformance needed to be corrected.  Dulanski brushed this off as unimportant, and no action was taken to correct the nonconformance.

62.     That same month, Dulanski also began to tighten his grip on Relator's ability to complete his work as an internal auditor.  On June 13, 2019, after Relator had shown Dulanski a drafted email to PCB personnel about a then-open action item to address an issue with potential AS9100-noncompliance implications, which had remained unresolved since it was first uncovered in 2018, Dulanski responded: "Remember, until further notice you are only allowed three types of email: Open Meeting, Closing Meeting and weekly Open NCR Report.  I will provide responses for you."  Similarly, after PCB employees expressed aggravation that Relator had been closely

scrutinizing them, Dulanski closed an audit that Relator had been working on without resolving any of the underlying nonconformance issues. Dulanski's obstructing exacerbated Relator's difficulty in completing his internal-audit work.

63.     In July 2019, Dulanski took his obstructing one step further. PCB was scheduled for an open audit meeting of which Relator ought to have been informed, given his role as an internal auditor. Dulanski did not tell Relator about this audit, and when Relator found out and asked Dulanski whether he should attend, Dulanski replied: "If you are needed then I will call you." Dulanski never called.

64.     As summer turned to fall, Relator continued doing his job—highlighting various noncompliance issues and trying his best to ensure that such issues were appropriately remedied.

**E.     Relator—Still Committed to Compliance Despite These Many Hindrances—Is Fired**

65.     On October 4, 2019, Relator emailed the Office of Risk & Compliance ("ORC") to further underscore his concerns. In his email, he explained the assortment of noncompliance issues and called attention to the apathetic compliance culture.

66.     On October 7, 2019, Relator sent another email to ORC. In this email, he specifically called attention to the counterfeit-parts-detection issues. He stated:

> My concern is that PCB is not taking a proactive approach to its' [sic] Counterfeit Parts Avoidance program, a requirement from [United States Department of Defense] contracts as well as other Customers' requirements (AS9100, etc.).
>
> . . . .
>
> These facts were presented to Management and the result was in my own words, **"let an outside party tell us we are not in compliance."**
> NOTE: PCB was cited for not having a Counterfeit Parts Avoidance Training program by Honeywell (KCP20180945-04) & our Registrar DQS (DNYULA1017-7; response OASIS). AS9100 requirements also compel PCB to address risk.
>
> . . . .

19

> I feel PCBs' [sic] Management is again risking our status as an AS9100 certified Supplier, possibly breaking our contractual obligations to our Customers, and potentially even ignoring [United States Department of Defense] requirements. I am fulfilling my obligation to "speak up," when I say PCBs' [sic] Management is not "striving to provide superior quality in their work."

The next day, ORC confirmed receipt of Relator's October 4 and 7 emails and advised him that it would contact him if it needed further information.

67.     On October 10, 2019, Relator prepared drafting another email to ORC regarding PCB's failure to take certain corrective actions, but he stopped midway through to meet with inspection auditors. After his meeting, he proceeded back to his cubicle to finish his ORC email, but he was intercepted by an HR representative. She escorted Relator to a room, where Dulanski was seated. The HR representative reminded Relator that he had been told how to "behave" and that he was not doing so; he was instead creating a "difficult" workplace and was "unteachable" as an internal auditor. She then told Relator that his employment was terminated. Throughout this entire exchange, Dulanski said nothing.

68.     About two weeks later, on October 28, 2019, Relator again emailed ORC. He explained that his employment had been terminated and described the October 10 meeting with the HR representative and Dulanski. The next day, ORC replied via email, reminding Relator that it was reviewing the information he had provided in his October 4 and 7 emails. ORC assured Relator: "We will be sure to reach out to you if we have any questions and need additional information." Relator never heard from ORC—or any PCB employee—again.

**F.     PCB's Noncompliance Results in Material, Fraudulent Misrepresentations Under Its Government Contracts, Which, in Turn, Causes the Submission of False Claims to the Government**

69.     The primary government contractors, as well as the Government itself, are unaware that PCB is currently failing to follow requirements like AS9100 but is signing off on these contracts as if it is.  This raises two disconcerting implications.

70.     First, because PCB still has an active AS9100 certification, its contracts with primary government contractors and the Government are still active.  Thus, when it supplies products under those contracts, its implied certification that it adhered to all its obligations under those contracts is fraudulent.  As the supply chain progresses, fully-made aeronautical products (including military aircrafts) are provided to the Government, and the Government pays for them in return.  These payment requests to the Government for goods—based upon impliedly false claims—violate the FCA.

71.     Second, and more importantly, military aircrafts built using unapproved, unvetted counterfeit parts pose a catastrophic danger to human life.  Because of PCB's fraudulent practices, there is a substantial possibility that the aircrafts for which it supplied the parts are defective and are at risk of malfunctioning.

72.     Not only are such misrepresentations fraudulent, but they are also material to the Government's decision for payment.  First, the use of counterfeit parts in the aircraft-building process comes with catastrophic, well-documented safety risks.  Moreover, the very instances of noncompliance that Relator uncovered during his tenure at PCB would have resulted in another suspension of *the same* contracts as when he had first joined the company, thereby indicating that, had the Government—or even the primary government contractors—known of such

nonconformities, PCB would not have received payment under its contracts. Thus, it is abundantly clear that PCB's misrepresentations were material to the Government's decision for payment.

## CONCLUSION

73.     PCB caused the United States to incur substantial damages by presenting, making, using, or causing to be presented, made, or used numerous false claims to the Government. The false claims have resulted in remuneration unlawfully received by PCB. More specifically, PCB violated numerous provisions of the FCA, including, but not limited to, the following: 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3730(h). In light of the foregoing, PCB is liable to the United States for civil penalties and treble damages. The estimated damages to the United States caused by the false claims alleged herein are significant.

## CLAIMS FOR RELIEF

### COUNT I
### False Claims Act: Presentation of False Claims
### (31 U.S.C. § 3729(a)(1))

74.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

75.     As more particularly set forth in the foregoing paragraphs, by misrepresentation adherence to contractual provisions that are material to the Government's ultimate decision to provide payment, PCB "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment of approval" in violation of 31 U.S.C. § 3729(a)(1).

76.     As a result of PCB's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at

least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from PCB's unlawful conduct as described herein.

**COUNT II**
**False Claims Act: Making or Using a False Record**
**or Statement to Cause a Claim to Be Paid**
**(31 U.S.C. § 3729(a)(2))**

77.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

78.     As more particularly set forth in the foregoing paragraphs, by falsely signing off on internal compliance reports to give the appearance of compliance with applicable government-contract provisions, PCB "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement – *i.e.*, the false certifications and representations made or caused to be made by the defendant – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

79.     As a result of PCB's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from PCB's unlawful conduct as described herein.

**COUNT III**
**Retaliation**
**(31 U.S.C. § 3730(h))**

80.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

81.     By virtue of the acts alleged herein, PCB threatened, harassed, and/or dismissed, and/or discriminated against Relator in the terms and conditions of his employment after he

lawfully reported what he believed to be fraudulent conduct or wrongdoing to his superiors and corporate representatives in violation of 31 U.S.C. § 3730(h).

82.     Relator seeks compensatory damages and other appropriate statutory relief pursuant to this section.

### PRAYER FOR RELIEF

WHEREFORE, for each of these claims, Relator requests the following relief from PCB:

a.     Three times the amount of damages that the Government sustained because of the acts of PCB;

b.     A civil penalty of $11,000 for each violation;

c.     An award to the Qui Tam Plaintiff for collecting civil penalties and damages;

d.     Award of an amount for reasonable expenses necessarily incurred;

e.     Award of the Qui Tam Plaintiff reasonable attorneys' fees and costs;

f.     Interest;

g.     Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with appropriate interest; (2) compensation for special damages sustained by Relator in an amount to be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and litigation costs in connection with Relator's § 3730(h) claim;

g.     Such further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury.

Respectfully submitted,

SPIRO HARRISON

By: */s/ David. B. Harrison*
David B. Harrison
363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
(973) 232-4109

*Attorneys for Plaintiff-Relator*

Dated: October 11, 2022

JS 44 (Rev. 04/21)

**CIVIL COVER SHEET**

22 CV 767

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA ex. rel. JOHN DOE

**DEFENDANTS**

PCB PIEZOTRONICS, INC., and Does 1-100

**(b)** County of Residence of First Listed Plaintiff   n/a
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Erie
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

David B. Harrison, Spiro Harrison, 363 Bloomfield Ave, Suite 2C, Montclair, NJ 07042, 973-232-4109

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| [x] 1 | U.S. Government Plaintiff | [ ] 3 Federal Question *(U.S. Government Not a Party)* |
| [ ] 2 | U.S. Government Defendant | [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                        *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [x] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | **PERSONAL INJURY** | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 320 Assault, Libel & Slander | [ ] 365 Personal Injury - Product Liability | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 345 Marine Product Liability | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 370 Other Fraud | **LABOR** | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 751 Family and Medical Leave Act | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 790 Other Labor Litigation | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 791 Employee Retirement Income Security Act | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | **SOCIAL SECURITY** | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | [ ] 861 HIA (1395ff) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | [ ] 862 Black Lung (923) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 863 DIWC/DIWW (405(g)) | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 864 SSID Title XVI | |
| | | [ ] 550 Civil Rights | [ ] 865 RSI (405(g)) | |
| | | [ ] 555 Prison Condition | **FEDERAL TAX SUITS** | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | | [ ] 462 Naturalization Application | | |
| | | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| [x] 1 Original Proceeding | [ ] 2 Removed from State Court | [ ] 3 Remanded from Appellate Court | [ ] 4 Reinstated or Reopened | [ ] 5 Transferred from Another District *(specify)* | [ ] 6 Multidistrict Litigation - Transfer | [ ] 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § § 3729 3730 (False Claims Act)
Brief description of cause:
qui tam action filed under seal alleging aeronautical fraud

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                           DOCKET NUMBER

DATE
10/11/2022

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT                  APPLYING IFP                  JUDGE                  MAG. JUDGE